**LAW OFFICE OF FRANCIS J. FLYNN, JR.**
Francis J. Flynn, Jr., SBN 304712
6057 Metropolitan Plz.
Los Angeles, California 90036-3211
Tele: 314-662-2836
Email: casey@lawofficeflynn.com

**ATTORNEY FOR PLAINTIFFS**
**AND THE PROPOSED CLASS**

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISO DIVISION

|  |  |
|---|---|
| ) | |
| ) | |
| ) | **CASE NO.: 3:23-cv-00313** |
| ) | |
| ) | **CLASS ACTION COMPLAINT FOR** |
| ) | **DECLARATORY AND INJUNCTIVE** |
| ) | **RELIEF FOR:** |
| ) | |

**MARY SMITH, individually and on behalf of all others similarly situated**

              **PLAINTIFFS,**

   v.

**SOUTHWEST AIRLINES CO.**

            **DEFENDANT.**

| | |
|---|---|
| (I) | **BREACH OF CONTRACT;** |
| (II) | **BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING;** |
| (III) | **VIOLATION OF BAILMENT;** |
| (IV) | **INJUNCTIVE RELIEF; AND** |
| (V) | **DECLARATORY RELIEF (28 U.S.C. §§ 2201 and 2202)** |

**JURY TRIAL DEMANDED**

Plaintiff MARY SMITH, ("Plaintiff"), individually and on behalf of all others similarly situated, by and through Plaintiffs' undersigned counsel, bring this class action lawsuit against SOUTHWEST AIRLINES CO. ("Defendant" or "Southwest") and alleges, based upon information and belief and the investigation of Plaintiff's counsel as follows:

## I. JURISDICTION

1. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because (a) the aggregated claims of putative class members exceeds $5 million, exclusive of interest and costs; (b) there are at least hundreds of putative class members; and (c) at least one of the members of the putative class is a citizen of a different state than Defendants.

2. This Court has personal jurisdiction over Defendant because Defendant, directly or through their agents, conduct business in the State of California and within this District. Specifically, Defendants markets in this District and operates flights to and from this District. Through their business operations in this District, Defendants intentionally avail themselves of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

3. Through its business operations in this District, Defendants intentionally availed themselves of the markets within this District and have sufficient minimum contacts with this State to render the exercise of jurisdiction by this Court just and proper.

### VENUE

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because the Court sits in a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

### INTRADISTRICT ASSIGNMENT

5. Pursuant to Northern Dist. LR 3-5 and Civil L.R. 3-2(c), assignment of this case to the San Jose Division of the United States District Court for the Northern District of California is proper because a large portion of the Class reside in this District and a substantial amount of substantial part of the events or omissions giving rise to the Class Members' claims occurred in this Division.

CLASS ACTION COMPLAINT
CASE NO.: 3:23-cv-00313

## II.     PARTIES

### A. PLAINTIFF

6.      Plaintiff MARY SMITH, over seventy years old, is a citizen of the state of California residing in Milpitas, California.

7.      Plaintiff purchased from Southwest a ticket for a flight on December 29, 2022 from San Jose, California (stop in Las Vegas) to Indianapolis, Indiana:   Confirmation# 3GQRVZ, 12/29/22: SJC(6:50AM) -LAS(10:20AM) -IND(Arrival @ 4:45PM)

8.      December 29, 2022, while Plaintiff, who is over seventy years old, was at the airport waiting for the delayed flight until Southwest cancelled Plaintiff's flight.  She waited for over 10 hours before the canceled the flight, and she was without her luggage for twelve hours.

9.      Southwest was unable to rebook her on a same day flight, but instead booked a flight for December 30, 2022.

10.     On December 30, 2022, Southwest canceled that booked flight.

11.     In fact, the next available flight on Southwest from San Jose, California to Indianapolis, Indiana was not until after January 3, 2022 (assuming that the next available flight would even take off.)

12.     As a result, Plaintiff was forced to purchase a replacement flight through Delta Airlines.

13.     Given the holiday season and the increased supply and demand created as a result of the Southwest debacle, the cost of the Delta Airlines ticket was $720.00 for one way flight.

14.     Defendant did not issue Plaintiff a refund of the price of Plaintiff's ticket.

15.     Defendant did not reimburse Plaintiff for her out of pocket expenses caused a result of cancelling her ticket within hours of the flight during the holiday season.

16.     To make matters worse, Plaintiff was without her luggage for nearly twelve hours,

CLASS ACTION COMPLAINT
CASE NO.: 3:23-cv-00313

3

which included (among other important belongings) her medication.

**B. DEFENDANT**

17.    Defendant SOUTHWEST AIRLINES CO. ("Southwest") is a corporation organized under the laws of Texas with a principal place of business located in Dallas, Texas.

18.    Southwest Airlines Co. (the "Company" or "Southwest") operates Southwest Airlines, a major passenger airline that provides scheduled air transportation in the United States and near-international markets. As of December 31, 2021, Southwest had a total of 728 Boeing 737 aircraft in its fleet and 121 destinations in 42 states, the District of Columbia, the Commonwealth of Puerto Rico, and ten near-international countries: Mexico, Jamaica, The Bahamas, Aruba, Dominican Republic, Costa Rica, Belize, Cuba, the Cayman Islands, and Turks and Caicos.[1]

19.    For 2021, the Company's average aircraft trip stage length was 790 miles, with an average duration of approximately 2.1 hours, as compared with an average aircraft trip stage length of 743 miles and an average duration of approximately 2.0 hours in 2020, and as compared with an average aircraft trip stage length of 748 miles and an average duration of approximately 2.0 hours in 2019.[2]

## A STRONG CALIFORNIA PRESENCE

20.    "Once singularly associated with Texas, Southwest is now an essential bridge across the north-south geographic divide in California, where white-collar workers, college students and families have come to rely on the airline the way New Yorkers depend on Amtrak or the Long Island Rail Road."[3]

---

[1] https://otp.tools.investis.com/clients/us/southwest/SEC/sec-show.aspx?Type=html&FilingId=15534609&CIK=0000092380&Index=10000
[2] https://otp.tools.investis.com/clients/us/southwest/SEC/sec-show.aspx?Type=html&FilingId=15534609&CIK=0000092380&Index=10000
[3] Southwest is California's 'Unofficial Airline.' The Meltdown Has Residents Anxious.  New York Times. https://www.nytimes.com/2022/12/29/us/southwest-california-commuters.html?searchResultPosition=1

CLASS ACTION COMPLAINT
CASE NO.: 3:23-cv-00313

4

21.     Southwest is the state's busiest airline, and more of its flights depart from California than from any other state in the nation, including Texas, where the company began.[4] Southwest is the top airline at seven of California's 10 busiest airports, accounting for more than half of all air traffic at the airports in Oakland, Sacramento, San Jose, Burbank and Long Beach.[5]

22.     "Southwest is almost the unofficial airline of California," Henry Harteveldt, an airlines analyst for Atmosphere Research Group, told my colleague Shawn Hubler after the airline's flight cancellations during the holidays left passengers stranded across the country.[6]

23.     In fact, "[t]wo-thirds of all seats for sale on flights within California are on Southwest flights, according to Mike Arnot, a spokesman for Cirium, an aviation analytics company. (United is a very distant second with 13 percent.)"[7]

24.     "Southwest is California's busiest airline, with some 800 flights scheduled on peak days, many of which ferry residents between Northern and Southern California."[8]

25.     "Despite mild winter weather, California's medium-size airports suffered some of the worst cancellation rates in the nation over the past week because Southwest accounts for so much of their traffic."[9]

26.     "Southwest is almost the unofficial airline of California," said Henry Harteveldt, an analyst based in San Francisco who covers airlines for Atmosphere Research Group.[10]

27.     Many Southwest passengers, told they might be stranded for days, scrambled to find tickets on buses, trains and other airlines. At one point this week, the only one-way ticket on short

---

[4] https://www.nytimes.com/2023/01/03/us/southwest-airline-california.html
[5] https://www.nytimes.com/2023/01/03/us/southwest-airline-california.html
[6] https://www.nytimes.com/2023/01/03/us/southwest-airline-california.html
[7] https://www.nytimes.com/2023/01/03/us/southwest-airline-california.html
[8] Southwest is California's 'Unofficial Airline.' The Meltdown Has Residents Anxious.  New York Times. https://www.nytimes.com/2022/12/29/us/southwest-california-commuters.html?searchResultPosition=1
[9] Southwest is California's 'Unofficial Airline.' The Meltdown Has Residents Anxious.  New York Times. https://www.nytimes.com/2022/12/29/us/southwest-california-commuters.html?searchResultPosition=11
[10] Southwest is California's 'Unofficial Airline.' The Meltdown Has Residents Anxious.  New York Times. https://www.nytimes.com/2022/12/29/us/southwest-california-commuters.html?searchResultPosition=1

CLASS ACTION COMPLAINT
CASE NO.: 3:23-cv-00313

notice from Sacramento to Los Angeles was a first-class seat on Delta Air Lines for nearly $700, several times more than passengers are used to paying on that leg.[11] Others made a beeline for the rental car offices and opted to endure the six to nine hours it normally takes to drive from Northern to Southern California, or vice versa.[12]

28.     The airline said in a statement Thursday that it had stabilized its operations and that it planned to resume its full flight schedule Friday "with minimal disruptions." Only a few dozen Friday flights had been canceled by midday Thursday — "good news for everyone," Harteveldt said.[13]

29.     Southwest operates more flights in California than in any other place in the nation, including its home state. Southwest "carried more California travelers to, from and within California than any other airline," according to the airline's 2021 annual report.[14]

30.     Southwest remains a minor player on California's busiest intrastate route between San Francisco and Los Angeles, but it overwhelmingly dominates air travel at seven of California's 10 busiest airports. The airline accounts for 68% of total seats for sale on flights within California, said Mike Arnot, a spokesperson for Cirium, an aviation analytics company, and serves tens of millions of passengers annually.[15]

31.     Southwest accounts for more than half of all air traffic at Sacramento International Airport.[16]

---

[11] Southwest is California's 'Unofficial Airline.' The Meltdown Has Residents Anxious.  New York Times. https://www.nytimes.com/2022/12/29/us/southwest-california-commuters.html?searchResultPosition=1
[12] Southwest is California's 'Unofficial Airline.' The Meltdown Has Residents Anxious.  New York Times. https://www.nytimes.com/2022/12/29/us/southwest-california-commuters.html?searchResultPosition=1
[13] Southwest is California's 'Unofficial Airline.' The Meltdown Has Residents Anxious.  New York Times. https://www.nytimes.com/2022/12/29/us/southwest-california-commuters.html?searchResultPosition=1
[14] Southwest is California's 'Unofficial Airline.' The Meltdown Has Residents Anxious.  New York Times. https://www.nytimes.com/2022/12/29/us/southwest-california-commuters.html?searchResultPosition=1
[15]
[16] Southwest is California's 'Unofficial Airline.' The Meltdown Has Residents Anxious.  New York Times. https://www.nytimes.com/2022/12/29/us/southwest-california-commuters.html?searchResultPosition=1

CLASS ACTION COMPLAINT
CASE NO.: 3:23-cv-00313

32.     While it barely has a toehold at San Francisco International Airport, Southwest accounted for 80% of traffic at nearby Oakland International Airport and 63% at San Jose International Airport in the 12-month period ending on Sept. 30, according to the Bureau of Transportation Statistics.

33.     Similarly, alternative non-Southwest flights from Saint Louis, Missouri to Los Angeles California reached a price of over $2,300.00 – one way – a flight that would have taken 18 hours to arrive.  Saint Louis, Missouri to Long Beach, California on the same day would have cost up to $2,901 (with 3 stops) for $2,901 and which would have taken nearly 20 and a half hours to arrive.

### SOUTHWEST'S OUTDATED SOFTWARE
### AND THE RESULTING CHAOS

34.     On June 13, 2020, when, the Baltimore Sun released an article titled "Southwest Glitch Delays BWI Flights: Problem With Computer System Affected Airports Nationwide, Airline's Website." This article discussed how Southwest Airlines experienced problems with its computer system for a significant part of an afternoon, causing "significant flight delay" at airports around the country. Specifically, for about three hours, visitors to Southwest.com could not check into their flights, purchase tickets, or check their flight's status. One traveler commented, "I'd like to know how a company as big as Southwest can have their whole server go down [. . .] Where's the backup plan?"

35.     According to FlightAware.com, this system failure delayed more than 600 flights as of 9:00 PM that day and resulted in 17 cancelled flights.

On August 12, 2020, USA Today released an article titled "'So I Guess Southwest has Invented Time Travel': Airline Sends Passengers Bizarre Flight Changes." This article detailed how Southwest Airlines' system would re-route travelers, but would make the crucial mistake of

CLASS ACTION COMPLAINT
CASE NO.: 3:23-cv-00313

scheduling travelers to arrive at a given airport after their connecting flights were due to leave. To illustrate, a traveler booked a nonstop flight from San Diego, California to Reno, Nevada, which was then re-routed to contain a connecting flight via Oakland, California. However, the connecting flight was due to leave 10 minutes before the first flight was scheduled to land.

36.     Southwest Airlines attempted to downplay the nonsensical flight changes by saying that passengers receiving such schedules had received preliminary flight change information that had not been finalized. One affected passenger was reportedly an information technology worker. She suspected that a computer glitch was to blame, and commented "[t]his should have been literally impossible [. . .]."

37.     But despite Southwest's assurances to the public, Southwest made no effort to remedy the technical flaws in its system but instead gave a dividend to its investors.

38.     Southwest relies on crew-assignment software called SkySolver, an off-the-shelf application that it has customized and updated, but that is nearing the end of its life, according to the airline.[17]

39.     The program was developed decades ago and is now owned by General Electric Co.[18]

40.     Ask Southwest Airlines employees about their company's technology, and one word keeps coming up: "antiquated."[19]

41.     "We've been harping on them since 2015-ish every year," Mike Santoro, a captain

---

[17] Southwest Meltdown Shows Airlines Need Tighter Software Integration. https://www.wsj.com/articles/southwest-meltdown-shows-airlines-need-tighter-software-integration-11672687980

[18] Southwest Meltdown Shows Airlines Need Tighter Software Integration. https://www.wsj.com/articles/southwest-meltdown-shows-airlines-need-tighter-software-integration-11672687980

[19] Insiders at Southwest reveal how the airline's service imploded. https://www.cnn.com/travel/article/southwest-airlines-meltdown-closer-look/index.html

CLASS ACTION COMPLAINT
CASE NO.: 3:23-cv-00313

and vice president of the Southwest Airlines Pilots Association, told CNN.[20]

42.     Southwest's scheduling system hasn't changed much since the 1990s, according to Captain Casey Murray, president of the Southwest Airlines Pilots Association.[21]

43.     Winter storms disrupted holiday travel during the 2022 holiday season, leaving thousands of travelers stranded in airports around the United States. However, not all domestic airlines were affected equally. Southwest Airlines flight cancellations accounted for the vast majority domestic flight cancellations, leaving travelers unable to visit loved ones over the holidays, and attracting the ire of the federal government.

44.     As flights were getting cancelled around the country, it soon emerged that the root cause behind Southwest Airlines' cancellations was outdated and ineffective technology, in particular, its crew scheduling system (called "Sky Solver"). Further compounding on this issue, Southwest Airlines used an aggressive flight schedule that left it prone to greater cancellations than its competitors in the event of unusual conditions, such as nationwide storms.

45.     The result: A massive Christmas travel meltdown that scuttled holiday plans for hundreds of thousands of passengers. Nearly 16,000 flights canceled. Orphaned baggage piling up at airports and travelers told to give a shipping address.[22]

---

[20]    Insiders    at    Southwest    reveal    how    the    airline's    service    imploded. https://www.cnn.com/travel/article/southwest-airlines-meltdown-closer-look/index.html
[21] How Southwest failed the holidays: Four charts explaining the cancellations. https://www.cnn.com/2022/12/29/business/southwest-cancellations-history-charts-dg/index.html
[22]    Insiders    at    Southwest    reveal    how    the    airline's    service    imploded. https://www.cnn.com/travel/article/southwest-airlines-meltdown-closer-look/index.html

CLASS ACTION COMPLAINT
CASE NO.: 3:23-cv-00313



*See*, Insiders at Southwest reveal how the airline's service imploded. Available at: https://www.cnn.com/travel/article/southwest-airlines-meltdown-closer-look/index.html. (Updated 30th December 2022); Last visited: January 11, 2023.

46.     During the winter storm, amid a huge volume of changes to crew schedules to work through, SkySolver couldn't handle the task of matching crew members and which flights they should work, executives of the Dallas-based carrier said.[23]

47.     Southwest's software wasn't designed to solve problems of that scale, Chief Operating Officer Andrew Watterson said Thursday, forcing the airline to revert to manual scheduling.[24]

48.     "The magnitude and scale of this disruption stressed our technology and processes, forcing a great deal of manual processing," Southwest said. "Our crews are showing up in every

---

[23]     Southwest     Meltdown     Shows     Airlines     Need     Tighter     Software     Integration. https://www.wsj.com/articles/southwest-meltdown-shows-airlines-need-tighter-software-integration-11672687980
[24]     Southwest     Meltdown     Shows     Airlines     Need     Tighter     Software     Integration. https://www.wsj.com/articles/southwest-meltdown-shows-airlines-need-tighter-software-integration-11672687980

CLASS ACTION COMPLAINT
CASE NO.: 3:23-cv-00313

way throughout this challenge."[25]

49.     Other airlines managed to recover by early this week; at Southwest, the cancellations only increased.[26]

50.     While Southwest does have major connecting airports, much of its schedule involves planes and crews crisscrossing the country -- a network that aviation watchers say is more vulnerable than legacy carriers' hub-and-spoke model that can contain a disruption to particular geographic regions.[27]

51.     When something goes wrong, the Southwest software -- including the crew scheduling system tool -- leaves much of the work of rebuilding that delicate network to be done manually.[28]

52.     "It can't see the best way to fix anything when flights are canceled," said Brian Brown, president of Transport Workers Union Local 550, representing Southwest dispatchers and meteorologists. "It requires a lot more human intervention and human eyesight or brainpower, and can only handle so much."[29]

53.     The result is that airline officials "don't necessarily know where our crews are, where our planes are," Brown said.[30]

54.     Crew schedulers in another department are manually checking which pilots and flight attendants meet strict federal rules on work hours -- rules meant to keep inflight safety

---

[25]     Insiders at Southwest reveal how the airline's service imploded. https://www.cnn.com/travel/article/southwest-airlines-meltdown-closer-look.html
[26]     Insiders at Southwest reveal how the airline's service imploded. https://www.cnn.com/travel/article/southwest-airlines-meltdown-closer-look.html
[27]     Insiders at Southwest reveal how the airline's service imploded. https://www.cnn.com/travel/article/southwest-airlines-meltdown-closer-look.html
[28]     Insiders at Southwest reveal how the airline's service imploded. https://www.cnn.com/travel/article/southwest-airlines-meltdown-closer-look.html
[29]     Insiders at Southwest reveal how the airline's service imploded. https://www.cnn.com/travel/article/southwest-airlines-meltdown-closer-look.html
[30]     Insiders at Southwest reveal how the airline's service imploded. https://www.cnn.com/travel/article/southwest-airlines-meltdown-closer-look.html

CLASS ACTION COMPLAINT
CASE NO.: 3:23-cv-00313

professionals from excessive fatigue.[31]

55.     "You end up with thousands of crew members having to call in and their wait times were hours just to talk to someone," Brown said. Software enhancements would make the process more efficient, he added.[32]

56.     The manual work meant crew members who could be working were instead stuck in lengthy phone queues waiting for instructions or for a hotel assignment to get their federally mandated rest.[33]

57.     "The phone systems that the company uses is just not working," Lyn Montgomery, who represents Southwest flight attendants at TWU Local 556, told CNN.[34]

58.     "They're just not manned with enough manpower in order to give the scheduling changes to flight attendants and that's created a ripple effect that is creating chaos throughout the nation."[35]

59.     Unlike some large rivals with hub-and-spoke networks, Southwest planes hopscotch from city to city, which may have been another complicating factor.[36]

60.     Multiple systems are involved in crew scheduling, according to a spokesman for GE Aerospace.[37]

---

[31]   Insiders at Southwest reveal how the airline's service imploded. https://www.cnn.com/travel/article/southwest-airlines-meltdown-closer-look/index.html
[32]   Insiders at Southwest reveal how the airline's service imploded. https://www.cnn.com/travel/article/southwest-airlines-meltdown-closer-look/index.html
[33]   Insiders at Southwest reveal how the airline's service imploded. https://www.cnn.com/travel/article/southwest-airlines-meltdown-closer-look/index.html
[34]   Insiders at Southwest reveal how the airline's service imploded. https://www.cnn.com/travel/article/southwest-airlines-meltdown-closer-look/index.html
[35]   Insiders at Southwest reveal how the airline's service imploded. https://www.cnn.com/travel/article/southwest-airlines-meltdown-closer-look/index.html
[36]   Southwest Meltdown Shows Airlines Need Tighter Software Integration. https://www.wsj.com/articles/southwest-meltdown-shows-airlines-need-tighter-software-integration-11672687980
[37]   Southwest Meltdown Shows Airlines Need Tighter Software Integration. https://www.wsj.com/articles/southwest-meltdown-shows-airlines-need-tighter-software-integration-11672687980

CLASS ACTION COMPLAINT
CASE NO.: 3:23-cv-00313

61.     The company said its software isn't an end-to-end solution.[38] Rather, it's a so-called backend algorithm that airlines can supplement with other software.[39] The algorithm gathers input from other systems to provide recommendations to resolve crew-related disruptions, according to GE Aerospace.[40]

62.     Dr. Edward Rothberg, chief scientist of Gurobi Optimization LLC, a startup that develops mathematical optimization software used by carriers including Air France-KLM, said Southwest's hopscotched "point-to-point" model—rather than the hub-and-spoke model – greatly increases the difficulty of the problem, requiring more computational power than its current systems are likely able to handle.[41]

63.     Southwest Chief Executive Officer Bob Jordan said that while the carrier has good systems in some areas, those systems still need "better intelligence to talk to each other."[42] For instance, he said "The Baker," an optimization system developed by Southwest to automate disruption recovery and select flights to cancel, needs "better visibility" into its crew-scheduling systems.[43] Airlines generally have done a better job of maintenance and repair operations, but are

---

[38] Southwest Meltdown Shows Airlines Need Tighter Software Integration.
https://www.wsj.com/articles/southwest-meltdown-shows-airlines-need-tighter-software-integration-11672687980
[39] Southwest Meltdown Shows Airlines Need Tighter Software Integration.
https://www.wsj.com/articles/southwest-meltdown-shows-airlines-need-tighter-software-integration-11672687980
[40] Southwest Meltdown Shows Airlines Need Tighter Software Integration.
https://www.wsj.com/articles/southwest-meltdown-shows-airlines-need-tighter-software-integration-11672687980
[41] Southwest Meltdown Shows Airlines Need Tighter Software Integration.
https://www.wsj.com/articles/southwest-meltdown-shows-airlines-need-tighter-software-integration-11672687980
[42] Southwest Meltdown Shows Airlines Need Tighter Software Integration.
https://www.wsj.com/articles/southwest-meltdown-shows-airlines-need-tighter-software-integration-11672687980
[43] Southwest Meltdown Shows Airlines Need Tighter Software Integration.
https://www.wsj.com/articles/southwest-meltdown-shows-airlines-need-tighter-software-integration-11672687980

CLASS ACTION COMPLAINT
CASE NO.: 3:23-cv-00313

1    much further behind in "the human aspect" of matching up crews, equipment, and passengers, said

2    R "Ray" Wang, founder and principal analyst at IT consulting firm Constellation Research Inc.[44]

3        64.    Updating technology systems is particularly challenging for air carriers because of

4    the business and operations risk of taking down a system, which can include grounded planes or

5    stranded passengers, Mr. Crawford said.[45]

### SOUTHWEST'S FLIGHT CANCELLATION DEBACLE

7        65.    Between December 22, 2022 and January 2, 2022, Southwest cancelled nearly

8    16,000 flights, stranding thousands of passengers during one of the busiest travel weeks of the

9    year.[46]

10

11       66.    Since Dec. 22, the beleaguered airline has canceled more than half of its typical

12   flight schedule, and by late Wednesday about 87% of all canceled flights in the US were from

13   Southwest alone, according to industry trackers FlightRadar24 and FlightAware.

14       67.    Southwest has consistently failed to perform as well as its competitors when it

15   comes to cancellations, according to bureau data.[47]

16

17       68.    In several years over the last decade, the airline had higher cancellation rates

18   compared to other major airlines, the data shows.[48]

19

20       69.    The December 2022 meltdown is not the first time the company has found itself

21   in this predicament. In October 2021, Southwest canceled more than 2,000 flights over a four-

22

---

23   [44] Southwest Meltdown Shows Airlines Need Tighter Software Integration.
     https://www.wsj.com/articles/southwest-meltdown-shows-airlines-need-tighter-software-integration-
24   11672687980
     [45] Southwest Meltdown Shows Airlines Need Tighter Software Integration.
25   https://www.wsj.com/articles/southwest-meltdown-shows-airlines-need-tighter-software-integration-
     11672687980
26   [46] https://www.cnn.com/travel/article/southwest-airlines-meltdown-closer-look/index.html
     [47] https://www.cnn.com/2022/12/29/business/southwest-cancellations-history-charts-
27   dg/index.html
     [48] https://www.cnn.com/2022/12/29/business/southwest-cancellations-history-charts-
28   dg/index.html

CLASS ACTION COMPLAINT
CASE NO.: 3:23-cv-00313

day period. While the airline blamed the crisis partly on bad weather in Florida, Southwest canceled flights for far longer than its competitors.

70.     Similar to this month's service mayhem, Southwest fared far worse than its competitors last October. While Southwest canceled hundreds of flights in the days following the peak of October's disruption, competitors quickly returned to normal service. Later that month, on a call with Wall Street analysts, then-CEO Gary Kelly said the company had made adjustments to prevent a similar meltdown in the future:

> "We have reined in our capacity plans to adjust to the current staffing environment, and our ontime performance has improved, accordingly," said Kelly on October 21. "We are aggressively hiring to a goal of approximately 5,000 new employees by the end of this year, and we are currently more than halfway toward that goal."

*See*,                    https://www.cnn.com/2022/12/27/business/southwest-airlines-service-meltdown/index.html#:~:text=In%20October%202021%2C%20Southwest%20canceled,to%20adjust%20to%20those%20problems.

71.     And, just like the latest disruption, the Southwest Airlines Pilots Association claimed the cancellations were due to "management's poor planning."[49]

72.     As early as 2020, Southwest has suffered from computer system glitches and/or crew scheduling technology issues.  For example, in June 2020, Baltimore Sun released an article titled "Southwest Glitch Delays BWI Flights: Problem With Computer System Affected Airports Nationwide, Airline's Website." This article discussed how Southwest Airlines experienced problems with its computer system for a significant part of an afternoon, causing "significant flight delay" at airports around the country. Specifically, for about three hours, visitors to Southwest.com could not check into their flights, purchase tickets, or check their flight's status. One traveler

---

[49] https://www.cnn.com/2022/12/27/business/southwest-airlines-service-meltdown/index.html#:~:text=In%20October%202021%2C%20Southwest%20canceled,to%20adjust%20to%20those%20problems.

CLASS ACTION COMPLAINT
CASE NO.: 3:23-cv-00313

commented, "I'd like to know how a company as big as Southwest can have their whole server go down [. . .] Where's the backup plan?"

<u>**SOUTHWEST AIRLINE'S CONTRACT OF CARRIAGE**</u>

73.     Southwest reservations, purchases, ticketing, and/or transportation are governed by Southwest's Contract of Carriage. *See*, Exhibit A.

74.     Specifically, the Contract of Carriage provides, in pertinent part:

**"1. Introduction**

**a. Application of Conditions of Contract**

(1) Except as otherwise provided within specific fare rules, **reservations, purchase, ticketing and/or transportation by Southwest Airlines Co.** (hereafter "Southwest Airlines" and its Officers, Employees, contractors, and agents acting in their official capacities under the direction of Southwest Airlines [collectively, together with Southwest Airlines hereafter "Carrier"]) **are subject to this Contract of Carriage in effect on the earliest of the date on which the Ticket is reserved, purchased, or issued, and as amended through the date of travel,** in addition to any terms, conditions, and restrictions applicable to your booking channel and included on any Ticket. The terms and conditions contained in this Contract of Carriage shall govern all published routes and services provided by the Carrier as well as all fares and charges published by the Carrier. [...]"

Exhibit A, Contract of Carriage at 4.

75. The Contract of Carriage further provides:

**2. Reservations**

**a. Reservations**

(1) A reservation on a given flight is confirmed by the issuance of a Ticket.

See, Exhibit A: Contract of Carriage at page 9.

76.     The Contract of Carriage further provides:

4.      Tickets [...]

[...]

c.      Refunds [...]

16

CLASS ACTION COMPLAINT
CASE NO.: 3:23-cv-00313

(6) Significant Delays or Involuntary Cancellations. If a Passenger's scheduled transportation is significantly disrupted by the Carrier before the Passenger has reached his or her final destination as a result of a flight cancellation, Carrier-caused missed connection, significant flight delay, significant schedule change, or omission of a scheduled stop caused by the Carrier, Carrier may do one of the following:

(i)     Transport the Passenger at no additional charge on another of Southwest Airlines flight(s);

(ii)    Refund the fare for the unused transportation in accordance with this Section 4; or

(iii)   Provide a Flight Credit or a Transferable Flight Credit depending on the fare purchased for the unused portion of the Customer's fare in accordance with this Section 4. See also Section 9.a.

77.     The Contract of Carriage further provides:

        4.      Tickets […]

        […]

                c.      Refunds […]

(3)  Form of Refunds. The Carrier shall make all refunds in U.S. dollars. See Section 8 for additional information for international travel. Eligible refunds must be requested no later than one year from the date the Ticket was issued. When no portion of the transportation has been provided, the eligible refund will be issued in accordance with this Section in an amount equal to the fare paid. When a portion of the transportation has been provided, the eligible refund will be issued in accordance with this Section in an amount equal to the difference, if any, between the total fare paid and the fare applicable to the transportation provided. Except as otherwise provided in this Contract of Carriage, following a request made by the Customer and received by the Carrier, if a Ticket or unused ancillary fee for optional services paid by a Customer is eligible for a refund, Carrier will issue such refunds as follows:

(i) At the direction of the Customer, refunds for Tickets purchased with a credit card shall be processed either:
    (a) For crediting to the credit card account used to purchase the Ticket, typically no later than seven (7) business days from the date the refund request is received by Southwest Airlines or;
    (b) To the form of a Flight Credit or a Transferable Flight Credit depending on the fare purchased.

(ii) Refunds for Tickets purchased with cash, if cash is accepted by Carrier,

CLASS ACTION COMPLAINT
CASE NO.: 3:23-cv-00313

typically will be issued by check no later than twenty (20) business days after the refund request is received by the Carrier.

(iii)  Refunds for Tickets purchased with an exchanged Ticket, Flight Credit, or Transferable Flight Credit, will be processed to the form of a Flight Credit or a Transferable Flight Credit depending on the fare purchased.

(iv)  Refunds for Tickets purchased with a Southwest® gift card will have the amount applied from the Southwest® gift card held as a Flight Credit or a Transferable Flight Credit depending on the fare purchased.

(v)  Refunds for Tickets purchased outside of Southwest Airlines (for example, through a travel agent or with a universal air travel plan number) shall be processed for crediting via the ticket issuer and may, for example, take the form of a credit to the subscriber against whose number the Ticket was charged or a Miscellaneous Charge Order, as applicable.

(vi)  Refunds for Tickets paid with any other form of payment (such as a Southwest LUV Voucher) will, in the Carrier's sole discretion, be issued back to the original form of payment (and subject to any limitations on the original form of payment, such as an expiration date) or be processed to the form of a Flight Credit or a Transferable Flight Credit depending on the fare purchased.

(vii)  Transferable Flight Credit. Unless otherwise stated by Southwest Airlines, at the direction of the Customer, the fare paid for unused Anytime or Business Select® fare segments, including taxes and government fees, may be held as a Transferable Flight Credit. When a Ticket combines an Anytime or Business Select fare segment with a Wanna Get Away® fare segment, if the Customer does not travel and the Customer cancels the Ticket at least ten (10) minutes prior to the scheduled departure time, then the fare paid for unused travel, including taxes and government fees, may be held as a Transferable Flight Credit. The Passenger named on the Ticket can (A) request a refund of the refundable segment associated with the Transferable Flight Credit in accordance with Section 4.c.(3), (B) use a Transferable Flight Credit for travel on Southwest Airlines, or (C) if such Passenger is a Rapid Rewards Member and their Rapid Rewards number is associated with the Transferable Flight Credit prior to transfer, transfer the Transferable Flight Credit to another Rapid Rewards Member. A Transferable Flight Credit may only be transferred once. Any Transferable Flight Credit resulting from a Ticket purchased via a corporate booking tool, a GDS, SWABIZ.com, or a Southwest Airlines mobile app or the Southwest Airlines mobile website using a valid corporate credential issued by Southwest Airlines may only be transferred between employees within the same organization. A refundable flight segment associated with a Transferable Flight Credit becomes nonrefundable following the transfer to another Passenger. Although transferable, a Transferable Flight Credit may

CLASS ACTION COMPLAINT
CASE NO.: 3:23-cv-00313

not be sold or bartered by the Passenger, a Customer, or any designee. Transferable Flight Credits obtained through prohibited sale or barter transactions are void and will not be honored for travel.

(viii) Limitation of Liability. As provided in this Contract of Carriage, Southwest Airlines may, at the discretion of Southwest Airlines, refund all or a portion of a refund payment to a person or entity other than the Passenger, which shall be deemed a valid refund. Carrier shall not be liable to the Passenger for another refund or Flight Credit or Transferable Flight Credit.

(4)    Nonrefundable Tickets.

(i) General. As the term "nonrefundable" reflects, the fare paid for unused travel by Passengers who purchase restricted, nonrefundable Tickets (including taxes and government fees) are not eligible for refunds, except as specifically stated in this Contract of Carriage, as provided in this Section, and as provided in Section 9.

(ii) Flight Credit. Unless otherwise stated by Southwest Airlines, the fare paid for unused Wanna Get Away® fare segments, including taxes and government fees, is, in the Carrier's sole discretion, refunded in accordance with Section 4(c)(3) or held as a Flight Credit either for use by the Passenger on Southwest Airlines or, as agreed to by Southwest Airlines, if evidence satisfactory to Southwest Airlines, in its sole discretion, is submitted to Southwest Airlines that an employer purchased the Ticket on behalf of its employee or the travel agent has made a refund to its client, then the Flight Credit may be held for use by the company or travel agent, as applicable.

(iii) Transferable Flight Credit. Unless otherwise stated by Southwest Airlines, the fare paid for unused Wanna Get Away Plus fare segments, including taxes and government fees, is, in the Carrier's sole discretion, refunded in accordance with Section 4(c)(3) or held as a Transferable Flight Credit. When a Ticket combines a Wanna Get Away Plus fare segment with a Wanna Get Away® fare segment, if the Customer does not travel and the Customer cancels the Ticket at least ten (10) minutes prior to the scheduled departure time, then the fare paid for unused travel, including taxes and government fees, may be held as a Transferable Flight Credit. The Passenger named on the Ticket can; (A) use a Transferable Flight Credit for travel on Southwest Airlines or, (B) if such Passenger is a Rapid Rewards Member and their Rapid Rewards number is associated with the Transferable Flight Credit prior to transfer, transfer the Transferable Flight Credit to another Rapid Rewards Member. A Transferable Flight Credit may only be transferred once. Any Transferable Flight Credit resulting from a Ticket purchased via a corporate booking tool, a GDS, SWABIZ.com, or a Southwest Airlines mobile app or the Southwest Airlines mobile website using a valid corporate credential issued by Southwest may only be transferred between employees within the same

CLASS ACTION COMPLAINT
CASE NO.: 3:23-cv-00313

organization. A refundable flight segment associated with a Transferable Flight Credit becomes nonrefundable following the transfer to another Passenger. Although transferable, a Transferable Flight Credit may not be sold or bartered by the Passenger, a Customer, or any designee. Transferable Flight Credits obtained through prohibited sale or barter transactions are void and will not be honored for travel. (iv) Changes and Exchanges. Ticket changes and exchanges within the same reservation will result in the initial Ticket being applied as the form of payment for the new Ticket. The new Ticket may be more or less expensive or subject to different terms, conditions, or restrictions from the original Ticket. If the fare is lower, in the Carrier's sole discretion, the difference will be refunded in accordance with Section 4(c)(3) or a Flight Credit or a Transferable Flight Credit depending on the fare purchased will be issued for the difference. No cash refund or credit card adjustments will be made for nonrefundable Tickets.

(5)     For Flight Credits or Transferable Flight Credits with an Expiration Date of July 27, 2022 or Earlier. If a Flight Credit or Transferable Flight Credit is not applied and travel completed on or before its expiration date, the entire amount of the Flight Credit or Transferable Flight Credit, including all taxes and government fees is forfeited.

78.  The Contract of Carriage provision the following in Section 9.

**9.     Service Interruptions**

Refer to Section 8 for conditions applicable to international travel.

a. Failure to Operate as Scheduled

(1) Canceled Flights or Irregular Operations. In the event the Carrier cancels or fails to operate any flight according to Southwest Airlines published schedule, or significantly changes the schedule of any flight, or there is a significant delay, Carrier will, at the request of a Passenger with a confirmed Ticket on such flight, take one of the following actions: (i) Transport the Passenger at no additional charge on Southwest Airlines next flight(s) on which space is available to the passenger's intended destination, in accordance with Southwest Airlines established re-accommodation practices; or (ii) Following a request by the Customer, refund the unused portion of the Customer's fare in accordance with Section 4.c.

(2) Diverted Flights. In the event the Carrier diverts any flight, the Carrier, at its sole discretion, will take reasonable steps to transport Passenger on Southwest Airlines next flight(s) on which space is available to his or her intended final destination or to provide reasonable accommodations as approved in writing in advance by Southwest Airlines.

(3) Flight Schedule Changes. Flight schedules are subject to change without notice, and times shown are not guaranteed. At times, without prior notice to

CLASS ACTION COMPLAINT
CASE NO.: 3:23-cv-00313

Passengers, Southwest Airlines may need to substitute other aircraft and may change, add, or omit intermediate stops. The Carrier cannot guarantee that Passengers will make connections to other flights operated by Southwest Airlines or by other airlines. In the event of flight schedule changes or service withdrawals, the Carrier will attempt to notify affected Passengers as early as possible.

(4) Limitation of Liability. Except to the extent provided in Section 9.a., the Carrier shall not be liable for any failure or delay in operating any flight, with or without notice, for reasons of aviation safety or when advisable, in its sole discretion, due to Force Majeure Events, as defined above. For the avoidance of doubt, under no circumstances will Carrier be liable to Passenger or Customer for consequential damages.

## **SOUTHWEST AIRLINE'S CUSTOMER SERVICE PLAN**

79.    Southwest Airline's Customer Service Plan states the following with respect to delays within seven days of departure:

**2.    Notifying Customers of known delays, cancelations, and diversions (for flights within seven days of departure)**

If your flight experiences a delay of 30 minutes or more, is canceled, or is diverted, we use an automated system to notify you within 30 minutes of our being made aware of such flight status change. Unless you opt out, you will be notified by email, voice, or text, depending on the selection made at the time the reservation was booked (voice notification is not available for international reservations). At the airport, including the departure gate and Flight Information Display screens under our control, we will make every reasonable effort to notify you of the updated status of your flight within 30 minutes of our being made aware of such flight status change. For an international itinerary, if you do not provide contact information at the time of booking, you will not receive automated notifications. For changes to a flight that is more than seven days from departure, see Section 10 below.

**3.    Delivering baggage on time**

We make every reasonable effort to load the items you entrust into our care onto the same plane you board and return them to you promptly at your destination. If delayed, we make every reasonable effort to return your luggage to you within 24 hours.

If your luggage is delayed or lost for reasons outside of your control, you may file a mishandled baggage report at the airport and submit a claim for consideration of reimbursement of reasonable expenses you may have incurred.  Southwest does not charge fees for the first and second checked bags (provided they are not oversize or overweight). If you paid a baggage fee to Southwest and your checked bag was delayed and not recovered, we refund the applicable fee(s) paid. See

CLASS ACTION COMPLAINT
CASE NO.: 3:23-cv-00313

Southwest.com for more information on traveling with checked baggage.

[…]

**5.      When a refund is due, providing it promptly**

Eligible refunds are provided according to the ticket's original form of payment and rules associated with that form of payment.

Refunds for eligible Southwest tickets purchased with a credit card will be credited back to the same credit card. Our Refunds Department processes credit card refunds within seven business days from the date we receive the request. Your credit card company may then take up to 10 business days to post the credit to your account, and, based on your individual billing cycle, you will see the refund on your credit card statement within one to two billing statements.

Refunds for eligible Southwest tickets purchased with cash will be issued by check no later than 20 business days after we receive your request.

Additional information on refunds is available at Southwest.com.

[…]

**8.      Handling "bumped" Passengers with fairness and consistency**

Southwest does not typically overbook flights; however, there may be instances where the number of Customers holding reservations exceeds the available seating capacity resulting in an oversale. In these situations, our Customer Service Agents will ask those who have checked in and received a boarding pass if they are willing to volunteer to take a later flight.

If we do not receive enough volunteers to accommodate all Customers who have purchased travel and have met our check-in requirements, we have to involuntarily deny boarding to Customers. If you are involuntarily denied boarding you will be given a written Notice of Denied Boarding to help understand our policies, compensation, and travel alternatives. You will generally be entitled to compensation and transportation on the next available Southwest flight. See Southwest.com for additional information.

**9.      Disclosing cancelation policies, frequent flyer rules, aircraft seating configuration, and lavatory availability**

Information about our cancelation policies, frequent flyer rules, aircraft-seating configuration, and lavatory availability is available over the phone with a Southwest Representative or by following the links to Southwest.com below:

● Cancelation of confirmed reservations

CLASS ACTION COMPLAINT
CASE NO.: 3:23-cv-00313

- Rapid Rewards Frequent Flyer Program

- Our Airplanes

**10.    Notifying Customers in a timely manner of changes in travel itineraries (more than seven days from departure)**

We sell flights several months in advance, and at times, we may adjust our schedules. We will notify you as far in advance as practicable of any change to your itinerary, including routing, departure time, and/or arrival time. We will attempt to notify you within 48 hours of our becoming aware of the change.

You will have the option to select the revised itinerary, or, if the itinerary change is significant, you may choose an alternate flight/date within a 14-day parameter of your original travel, or cancel your trip without penalty and receive a refund upon request in accordance with our Contract of Carriage. For changes within seven days of departure, refer to Section 2 above.

**11.    Ensuring responsiveness to Customer complaints**

Compliments, complaints, or questions about service? Email, call, or write to us. Written complaints will receive an acknowledgement in writing indicating receipt of the complaint within 30 days of receipt. You will also receive a substantive response no later than 60 days after our receipt of your complaint. Contact information is available at Southwest.com.

**12.    Identifying the services we offer to help mitigate Customer inconveniences during irregular operations**

Southwest intends to operate flights as scheduled; however, there are situations that arise based on either uncontrollable and/or controllable circumstances that may cause a flight to be significantly delayed and/or canceled.

For significant flight delays or Southwest-initiated cancelations that are within our control (e.g., mechanical problems, aircraft swap) we will rebook you on the next available Southwest flight(s) with seats available to your ticketed destination at no additional cost. If you choose not to travel due to a significant delay and/or cancelation, Southwest will issue a refund of the unused portion of your Southwest ticket upon request in accordance with our Contract of Carriage.

During flight delays that are within our control of three (3) or more hours and/or Southwest-initiated cancelations that are within our control that result in a wait of three (3) or more hours for a flight at the airport, we will provide a meal voucher upon request at the airport for participating vendors within the airport or, if participating vendors and/or vouchers are not available, we will honor reasonable requests for reimbursement for meals purchased during such irregular operations. Additionally, we may provide complimentary snacks and beverages for Customers.

CLASS ACTION COMPLAINT
CASE NO.: 3:23-cv-00313

If Southwest flight accommodations departing on the same day to your intended destination or applicable co-terminal city are not available following a flight delay or Southwest-initiated cancelation that is within our control (e.g., mechanical problems, aircraft swap), resulting in an overnight delay or stay, we will arrange lodging accommodations upon request if available, or will honor reasonable requests for reimbursement for lodging accommodations (provided you do not reside locally). If the lodging accommodation we arrange does not provide shuttle service to/from the airport, we will offer a voucher upon request or honor reasonable requests for reimbursement for ground transportation.

For significant flight delays or Southwest-initiated cancelations that are not within our control (e.g., weather, Air Traffic Control, safety/security-related events, FAA-required crew duty limitations, infrastructure/utility problems), we will rebook you on the next available Southwest flight(s) with seats available to the Customer's ticketed destination at no additional cost. If you choose not to travel due to a significant delay and/or cancellation, Southwest will issue a refund of the unused portion of your Southwest ticket upon request in accordance with our Contract of Carriage.

Although we do not offer complimentary lodging accommodations for significant flight delays or Southwest-initiated cancelations that are not in our control, we will seek to arrange a discount off of a lodging accommodation near the airport.

## EQUITABLE TOLLING OF STATUTES OF LIMITATIONS

80.     The running of any statute of limitations has been equitably tolled by Defendants' fraudulent concealment and/or omissions of critical information about the cause of its delays and/or cancellations. Through its affirmative misrepresentations and omissions, Southwest actively concealed from Plaintiffs reason(s) for the flight delays and/or cancellations.

81.     As a result of Defendants' actions, Plaintiffs were unaware, and could not have reasonably known or learned through reasonable diligence, the true reason that the flights were delayed and/or cancelled and which caused Plaintiff and the class members the harms set forth herein and that those harms were the direct and proximate result of Defendants' acts and omissions.

## CLASS ACTION ALLEGATIONS

82.     Pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(2) and (b)(3), as applicable, Plaintiff seeks certification of the following nationwide class (the "Nationwide Class"):

CLASS ACTION COMPLAINT
CASE NO.: 3:23-cv-00313

All persons in the United States who purchased tickets for travel on a Southwest Airlines flight and that flight was delayed and/or cancelled (including, but not limited to in June 2020, October 2021, and December 24, 2022-January 2, 2022), and who were not provided a refund and/or reimbursed for incurred expenses as a result of the delay and/or cancellation.

83.     Pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(2) and (b)(3), as applicable, Plaintiff seeks certification of the following nationwide sub-class (the "Nationwide Sub-Class"):

All persons in the United States who purchased tickets for travel on a Southwest Airlines flight and that flight was delayed and/or cancelled from December 24, 2022 and January 2, 2022 and who were not provided a refund and/or reimbursed for incurred expenses as a result of the delay and/or cancellation and who checked luggage between December 24, 2022 and January 2, 2022.

84.     Excluded from the Class are Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class are any judicial officer presiding over this matter, members of their immediate family, and members of their judicial staff, and any Judge sitting in the presiding court system who may hear an appeal of any judgment entered.

85.     The Class and Sub-Class are collectively referred to herein as the "Class".

86.     Plaintiff reserves the right to amend or modify the Class definition with greater specificity or division after having had an opportunity to conduct discovery.

87.     Plaintiff seeks only damages and injunctive relief on behalf of themselves and the Class members. Plaintiffs disclaim any intent or right to seek any recovery in this action for personal injuries, wrongful death, or emotional distress suffered by Plaintiffs and/or the Class members.

88.     The Class meets the criteria for certification under Rule 23(a), (b)(1), (b)(2), (b)(3) and (c)(4).

89.     **Risk of Inconsistent or Varying Adjudications. Fed. R. Civ. P. 23(b)(1).** As the proposed class members include thousands of persons across all 50 states, there is significant risk of inconsistent or varying adjudications with respect to individual class members that would

CLASS ACTION COMPLAINT
CASE NO.: 3:23-cv-00313

establish incompatible standards of conduct for the Defendant. For example, declaratory relief may be entered in multiple cases, but the ordered relief may vary, causing the Defendant to have to choose the court order with which it will comply.

90.     **Numerosity. Fed. R. Civ. P. 23(a)(1).** Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that the joinder of all members is impractical. While the exact number of class members is unknown to Plaintiff at this time, it is believed that the Class is comprised of tens of thousands if not hundreds of thousands of members geographically dispersed throughout the United States. Affected consumer's names and addresses are available from Southwest's records, and class members may be notified of the pendency of this action by recognized, court-approved notice dissemination methods, which may include electronic mail, U.S. Mail, internet notice, and/or published notice.

91.     **Predominance of Common Issues. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual class members. The common questions include:

a.     Whether Defendant's conduct breaches its Contract of Carriage and/or Customer Service Plan;

b.     Whether Defendant breached the Covenant of Good Faith and Fair Dealing;

c.     Whether Defendant committed a Violation of Bailment;

d.     Whether Defendant is required to give a refund and reimburse all related expenses as a result of the cancellations;

e.     Whether Plaintiff and members of the Class are entitled to damages, costs, or attorneys' fees from Defendant; and

f.     Whether Plaintiff and members of the Class are entitled to compensatory damages.

g.     Whether Plaintiff and the Class are entitled to declaratory relief;

CLASS ACTION COMPLAINT
CASE NO.: 3:23-cv-00313

h.      Whether Plaintiff and the Class are entitled to injunctive relief.

92.      **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of other Class members' claims because Plaintiff and Class members were subjected to the same unlawful conduct and damaged in the same way. Defendant's conduct that gave rise to the claims of Plaintiff and other Class members (i.e., canceling flights without giving refunds in breach of the Contract of Carriage) is the same for all Class members.

93.      **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter against Defendant to obtain relief for the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff's counsel are competent and experienced in litigating class actions, including extensive experience in litigating consumer claims. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the interests of the Class.

94.      **Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs and class members may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class members are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each Class member would also strain the court system. Moreover, individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of

CLASS ACTION COMPLAINT
CASE NO.: 3:23-cv-00313

1    scale, and comprehensive supervision by a single court.

2        95.    **Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and

3    (c). Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable

4    to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

5    Moreover, Defendant continues to offer credits instead of refunds to Plaintiff and Class members

6    for flights that they cancel, thus making declaratory relief a live issue and appropriate to the Class

7    as a whole.

8

9                                **COUNT I**
                          **BREACH OF CONTRACT**
10                    **(on behalf of Plaintiffs and the Class)**

11       96.    Plaintiff realleges and reincorporates its allegations in paragraphs 1 through 87

12   above as if fully set forth herein.

13       97.    This claim for breach of contract damages or, in the alternative, specific performance

14   of the contract's refund terms, is based on Defendant's breaches of its Contract of Carriage and/or

15   Customer Service Plan (the "Contract").

16

17       98.    Plaintiff, along with all putative class members, entered into a Contract of Carriage

18   and/or Customer Service Plan with Defendant for provision of air travel in exchange for payment.

19       99.    The Contract of Carriage and/or Customer Service Plan were each drafted by

20   Defendant.

21

22       100.   Plaintiff, and all putative class members performed under the Contract of Carriage

23   and/or Customer Service Plan, specifically, by tendering payment for the airline tickets to

24   Defendant and complied with all conditions precedent under the Contract.

25       101.   Due to Defendant's cancellation of their flights, Plaintiff, and all putative class

26   members cannot use their airline tickets through no fault of their own and they are not getting the

27   benefit of their bargain with Defendant.

28

CLASS ACTION COMPLAINT
CASE NO.: 3:23-cv-00313

102.    Under the terms of the Contract of Carriage and/or Customer Service Plan drafted by Defendant, Plaintiff and putative class members are entitled to refunds because Southwest canceled their flights and did not rebook the customers on another flight. By failing to provide refunds, Southwest has breached its Contract of Carriage and/or Customer Service Plan.

103.    In fact, Plaintiff had to incur the exorbitant out-of-pocket expenses by buying a different ticket home to San Jose on Delta Air Lines and has not been reimbursed for incurred expenses as a result of the cancellation.

104.    Southwest has further breached its Contract of Carriage and/or Customer Service Plan by failing to provide refunds within seven days for canceled tickets purchased with credit cards.

105.    As a result of Defendant's breaches of contract, Plaintiff and the putative class members have incurred damages in an amount to be proven at trial.

## COUNT II
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### (on behalf of Plaintiffs and the Class)

106.    Plaintiff realleges and reincorporates its allegations in paragraphs 1 through 97 above as if fully set forth herein.

107.    Southwest Airlines were owed a duty of good faith and fair dealing in regards to its Contract of Carriage and/or Customer Service Plan with Plaintiff and Class Members, notably having working software allowing its flights to be properly staffed and having contingencies for foreseeable winter storms.

108.    Southwest Airlines' breaches of its' duty of good faith and fair dealing in regards to its Contract of Carriage and/or Customer Service Plan with Plaintiff and Class Members for the reasons stated herein.

109.    Southwest Airlines' breaches of its' duty of good faith and fair dealing in regards to

CLASS ACTION COMPLAINT
CASE NO.: 3:23-cv-00313

its Contract of Carriage and/or Customer Service Plan with are the direct and proximate cause of Plaintiff and class members' damages.

110. As a result, Plaintiff and class members are each entitled to an award of damages in an amount to be determined at trial.

**COUNT III**
**VIOLATION OF BAILMENT**
**(on behalf of Plaintiff and the Nationwide Sub-Class Members)**

111. Plaintiff realleges and reincorporates its allegations in paragraphs 1 through 87 above as if fully set forth herein.

112. Plaintiffs and Class Members delivered and entrusted their luggage to Defendant for the purpose of enabling Defendant to conduct its business flying Plaintiff and Class Members to their destinations.

113. A bailment arises where possession, but not ownership, of property is transferred from one party ("bailor") to another ("bailee"). Where a bailee has received a bailment from a bailor, a duty of care is owed. Typically, a bailee is strictly liable for the bailment.

114. In delivering and entrusting their luggage, Plaintiff and Class members intended and understood that Defendants would adequately safeguard their luggage.

115. Defendants accepted possession of Plaintiffs' and Class members' luggage, and by accepting possession of Plaintiff's and Class members' luggage, Defendants understood that Plaintiff and other Class members expected it to adequately safeguard their luggage. Accordingly, a bailment was established for the mutual benefit of the parties.

116. During the period of bailment, Defendant, as bailee, owed Plaintiff and all other Class members a duty of care to safeguard their luggage by maintaining adequate procedures and infrastructure to protect such luggage. In failing to maintain such adequate procedures and infrastructure, Southwest breached this duty.

CLASS ACTION COMPLAINT
CASE NO.: 3:23-cv-00313

117.    Defendant, as bailee, is expected to return to its owner the bailed goods (the luggage) when the bailee's time for possession of them is over.

118.    During the period of bailment, Defendant, as bailee, owed Plaintiffs and Class Members a duty of care to safeguard their luggage by maintaining reasonable procedures and practices to protect such luggage.

119.    As alleged herein, Defendant breached this duty.

120.    As a result of Defendant's breach of this duty, Plaintiffs and all other Class Members have been harmed as alleged herein.

**COUNT IV**
**INJUNCTIVE RELIEF**
**(on behalf of Plaintiff and the Class Members)**

121.    Plaintiff restates and realleges paragraphs 1-117 of this Class Action Complaint as though fully set forth herein.

122.    Plaintiff and Class Members have clear and ascertainable rights in need of protection – namely: (a) the right to have Defendants abide by their obligations under the Contract of Carriage and/or Customer Service Plan when they book a flight with Defendant; (b) the right to not have travel impacted due to Defendant's antiquated crew scheduling technology and/or SkySolver technology and inability to schedule crews and get flights off of the ground in a timely manner.

123.    Plaintiff and Class Members have no adequate remedy at law because a legal remedy cannot protect Plaintiffs from future flights being impacted as a result of antiquated crew scheduling technology and/or SkySolver technology and cannot otherwise prevent Defendant's antiquated crew scheduling technology and/or SkySolver technology from causing delays and cancellations in the future.

124.    Plaintiff and Class Members will suffer irreparable harm, as alleged herein, caused by Defendants if their antiquated crew scheduling technology and/or SkySolver technology is not

CLASS ACTION COMPLAINT
CASE NO.: 3:23-cv-00313

replaced or updated, requiring injunctive relief.

125.    Plaintiff and Class Members are likely to succeed on the merits because, as alleged herein, Defendants promised to provide a flight at a particular time and date and, unless they are forced to update their technology in a timely manner, Plaintiff's travel may be negatively impacted via unnecessary flight delays and/or cancellations due to its antiquated crew scheduling technology. Plaintiff and Class Members seek injunctive relief: (a) requiring Defendant to update or replace its antiquated crew scheduling technology and/or SkySolver technology; and (b) refunding Plaintiff's and the Class Members ticket fees and add on fees automatically.

**COUNT V**
**DECLARATORY RELIEF**
**28 U.S.C. §§ 2201 and 2202**
**(on behalf of Plaintiffs and the Class)**

126.    Plaintiff, individually and on behalf of all others similarly situated and reallege Paragraphs 1-123 as if fully set forth herein.

127.    An actual controversy has arisen and now exists between the parties in that Plaintiff contends, and are informed and believe that Defendant fails to comply with applicable laws, including both common law and statutory law.

128.    A judicial declaration is necessary and appropriate at this time in order that each of the parties may know their respective rights and duties and act accordingly.

129.    Plaintiff's claims are warranted by existing law or by non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law.

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of all putative Class members, respectfully requests that the Court enter judgment in their favor and against Defendant as follows:

A.    For an Order determining at the earliest possible time that this matter may proceed

CLASS ACTION COMPLAINT
CASE NO.: 3:23-cv-00313

as a class action under Rule 23 and certifying this case as such;

B.      For Plaintiff and each Class member their actual compensatory damages, or in the alternative, for specific performance of the refund provisions of the Contract of Carriage and/or Customer Service Plan;

C.      For injunctive relief requiring Southwest to replace and/or update its antiquated crew scheduling technology and/or SkySolver technology; and refunding Plaintiff's and the Class Members ticket fees and add on fees automatically.

D.      For reasonable attorneys' fees and costs of suit;

E.      For pre-judgment interest and interest pursuant to redhibition; and

F.      Such further and other relief the Court deems reasonable and just.

## JURY DEMAND

Plaintiff, on behalf of himself and the Class of all others similarly situated, hereby demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Date:  1/22/2023          By:   /s/   Francis J. "Casey" Flynn, Jr.

**LAW OFFICE OF FRANCIS J. FLYNN, JR.**
Francis J. "Casey" Flynn, Jr.
6057 Metropolitan Plz.
Los Angeles, California 90036
Tele: 314-662-2836
Email: casey@lawofficeflynn.com

**ATTORNEY FOR PLAINTIFFS**

CLASS ACTION COMPLAINT
CASE NO.: 3:23-cv-00313